(C. D. 1495)

YARDLEY OF LONDON, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 5, 1953)

*Brooks & Brooks* (*Thomas J. McKenna* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Richard H. Welsh*, special attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The importation, the subject of this controversy, consists of two "Albro" powder filling machines and parts thereof imported·from England.

The collector of customs classified the mechanisms within the provision of paragraph 372 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 372) for "all other machines, finished or unfinished, not specially provided for," and parts thereof, and assessed duty thereon at the rate of 27½ per centum ad valorem. It appears that the collector's decision was based upon the premise that the machines in question were "packaging" machines and, therefore, excluded from the benefit of said paragraph 372, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

The plaintiff contends that the machines are properly dutiable at 15 per centum ad valorem either pursuant to the provision in paragraph 372, as modified, *supra*, for other "Machines, finished or unfinished, not specially provided for," or in paragraph 353 of said act (19 U. S. C. Sec. 1001, par. 353), as modified by said trade agreement, as "articles having as an essential feature an electrical element or device." The provisions of the tariff act as modified, *supra*, relied upon by plaintiff, are set forth below:

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 372 | Machines, finished or unfinished, not specially provided for: <br><br> Machines for packaging pipe tobacco; machines for wrapping cigarette packages; machines for wrapping candy; and combination candy cutting and wrapping machines_____ | 10% ad val. |
| | \*   \*   \*   \*   \*   \*   \* <br> Other (except wrapping and packaging machines; food grinding or cutting machines; machines for determining the strength of materials or articles in tension, compression, torsion, or shear; machines for making paper pulp or paper; machines for manufacturing chocolate or confectionery; and internal-combustion engines)_____ | 15% ad val. |

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 353 | Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for: <br> *   *   *   *   *   *   * <br> Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or shear; flashlights; batteries; vacuum cleaners; and internal-combustion engines) _____ | 15% ad val. |

The General Agreement on Tariffs and Trade also provides for parts of the above articles at "the same rate of duty as the articles of which they are parts."

In addition to the testimony of one witness, who appeared on behalf of the plaintiff and which will be adverted to *infra*, the following illustrative exhibits were introduced by plaintiff and were received in evidence:

Exhibit 1—Photograph of Albro 2-Head Fillers. Portions marked "X" and "Y" do not constitute a part of the machine.

Exhibit 2—Empty container typical of one of those filled by said machine.

Exhibit 3— Cap for container in evidence as exhibit 2.

Exhibit 4 —Carton for holding three containers.

Exhibit 5—Photograph showing one of the imported machines in operation together with the processing table.

Exhibit 6—Filled container as it comes from the machine.

Exhibit 7—Paper or cardboard container, also used in conjunction with the imported machine.

Exhibit 8—Base for filled paper container represented by exhibit 7.

Exhibit 9—Cover to be placed on top of exhibits 7 and 8 when assembled.

Exhibit 10—Flat folding paper box used as container for assembled exhibits 7, 8, and 9.

Exhibit 11—Representing exhibits 7, 8, and 9 as they are wrapped with paper before being placed in exhibit 10.

George Bousfield, works manager for Yardley of London, Inc., plaintiff herein, testified as follows as to the operation of the machines in controversy:

The machine is operated by one operator. She places the part to be filled in a cup, and the cup rises automatically and it is subject to a vacuum and the commodity which it is to contain flows in and fills the vacuum. When one cup has been filled, it recedes, comes down, descends, and the opener [operator] removes it. The other cup is done in exactly the same fashion and the two cups operate alternately.

The witness indicated by the letter "A" on illustrative exhibit 1 the portion of the machine which was referred to as "cups." He stated further that the container represented by illustrative exhibit 2 is manually placed in the machine by an operator and that it is later manually removed from the machine by the same operator. The machine creates a vacuum in the container and deposits powder in the container to displace the vacuum. Expressed in other words, it would be correct to say that the machine discharges a certain quantity of powder into a container.

At this point the function of the imported machine is complete.

Subsequent to the operation above described, it appears that several other processes are required in order to place merchandise in condition for transportation and sale. In this connection, the exhibits above enumerated were referred to and the following testimony given.

When the operator manually removes a container (typical of which are illustrative exhibits 2 and 7) from the machine, it is placed on a conveyor belt, approximately 60 feet in length, and the container is carried away. With reference to illustrative exhibit 2, a cap is placed over the container to close it, and surplus powder which may have accumulated on the outside of said container is removed by hand with a dust cloth. Three of these containers are then inserted into a flat folding paper box separated by a partition, the box previously having been dated (illustrative exhibit 4).

Bousfield stated that there are a great many different sizes and shapes of containers which, by the use of various attachments, may be filled by the machines in controversy. Illustrative exhibit 7 is representative of another type of container which is used in conjunction with these machines.

After this latter container filled with powder is manually removed from the machine, it is called a drum. The drum is covered with a base (illustrative exhibit 8), which has to be pressed down on to the drum by a small press (the press being a completely different machine from the machine in controversy). The two parts are then inserted right side up and a powder puff is placed by hand in the top of the box.

A booklet is also inserted on top of the powder puff. Any surplus powder that might be deposited on either illustrative exhibit 7 or 8 is removed by hand. The next operation is to place a cover (illustrative exhibit 9) on top of the assembled portions, exhibits 7 and 8. It is then dusted again and wrapped by hand (illustrative exhibit 11), and is inserted into a flat folding paper box represented by illustrative exhibit 10.

From the above explanation of the various steps necessary to place a container of powder in condition for transportation and sale, it is evident that the machines here in controversy perform but one of the preliminary steps in the over-all process.

Considering paragraph 372, as modified, *supra*, in its entirety, we find *inter alia* provisions for "machines for packaging pipe tobacco"; "machines for wrapping cigarette packages"; "machines for wrapping candy"; and "combination candy cutting and wrapping machines," and a catch-all provision for "Other (except wrapping and packaging machines) * * *." This latter exception, read in the light of the foregoing *eo nomine* provisions, would connote a machine which would perform the function of wrapping and packaging similar to the machines named.

It would seem that the machines in controversy in no event could be termed wrapping and packaging machines; neither could they be regarded as packaging machines, as classified by the collector of customs. It appears that the mechanisms in issue perform the single function of filling the containers with powder. Consequently, it can hardly be said that they either wrap or package the powder in view of the following definitions:

Webster's New International Dictionary, second edition:

**package,** *v. t.*; * * * packaging. To make up into a package; also, to enclose in a package or container.

**wrap,** *v.*; * * * wrapping. * * * *Transitive*: **1.** To cover by winding or folding; * * * **3.** To envelop, as with paper, and secure, as with string, for protection during, or convenience or suitableness for, transportation or storage; to enclose in a package, parcel, or bundle; to do up; * * *.

Funk & Wagnalls New Standard Dictionary of the English Language:

**wrap,** *vt.* * * * wrapping. * * * **2.** To surround and cover by winding or folding; infold; envelop: commonly followed by *in* or *with*, and often intensified by *up*; as, to *wrap* a package *in* paper; * * *.

In the condition the containers come from the powder filling machine they can not be said to have been made up "into a package," or enclosed "in a package or container," or "secure * * * for protection during, or convenience or suitableness for, transportation or storage."

In the brief of counsel for defendant it is contended that an ambiguity exists in the language of the excepting clause here being considered, and that, therefore, resort to trade agreement digests is in order, citing *C. H. Powell Co. et al.* v. *United States*, 34 C. C. P. A. (Customs) 29, C. A. D. 340. In view of the conclusion we have reached, we find it unnecessary to construe the scope and meaning of the excluding language for the simple reason that in our opinion the imported machines are neither wrapping nor packaging machines.

Upon the record before us, we find that the "Albro" powder filling machines in controversy and parts thereof are not excepted from the provision in paragraph 372 of the Tariff Act of 1930, as modified, *supra*, for other machines (except wrapping and packaging machines) for which a rate of duty of 15 per centum ad valorem is provided.

Consideration must now be given to the claim of plaintiff that the imported mechanisms come within the provision for other articles having as an essential feature an electrical element or device in paragraph 353 of said act, as modified, *supra*.

The record before us discloses that the powder filling machines here in issue were imported without the motive power to propel them. It appears from the testimony of witness Bousfield that subsequent to importation electric motors of American manufacture are affixed to the machines at the point where the word "Albro" appears on plaintiff's illustrative exhibit 1. The motors are connected to the machines by means of round leather belts fastened to pulleys on the machines and on the motors.

Bousfield admitted that the machines could be operated in the condition as imported by means of a tread mill or a steam engine, although "it would be a very inefficient and stupid way to do it," and that such means of operation would not entail a revamping of the machines themselves. In answer to a question on redirect examination as follows:

If you were to adapt the imported machines to the use of motive power other than an electric motor, would you have to change your manner of doing business or your structural set-up of your machine? Do you understand the question?

the witness stated—

To operate the machine by any other means than an electric motor would require considerable changes *in the way we operate that department.* [Italics supplied.]

The case of *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050, sets forth the applicability to imported merchandise of the provisions of paragraph 353, *supra*, in the following language:

There are two inquiries, therefore, when the question of the classifiability of an article under this division of the paragraph is under consideration: First, is it

essentially an electrical article? The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended, for, it must be manifest, that if it be not an electrical article, it does not come within the division at all. Second, if it is such an electrical article, is it an article named in the language, or within the class of articles named in this paragraph?

From what has been said, it follows that if the article, when it is imported, is designed and constructed to use electrical power, or other power, interchangeably, then it has not, as an essential feature, an electrical element or device.

We are not satisfied from the evidence here presented that the powder filling machines in controversy are so designed and constructed as to make the electric motors which are affixed subsequent to importation essential to their operation within the principles laid down by the *Dryden* case, *supra*. The claim of plaintiff for classification of the imported articles within the provisions of paragraph 353, as modified, *supra*, is therefore overruled.

We hold that the powder filling machines and parts thereof should properly have been classified as other machines (except wrapping and packaging machines), and parts thereof, within the provisions of paragraph 372, as modified, *supra*, and assessed with duty at the rate of 15 per centum ad valorem. That claim of plaintiff is sustained.

Judgment will be entered accordingly.